## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**PT. JAWAMANIS RAFINASI**                                   **CIVIL ACTION**

**VERSUS**                                                   **NUMBER 09-7490**

**COASTAL CARGO COMPANY, INC.**                              **SECTION "L" (3)**

### FINDINGS OF FACT & CONCLUSIONS OF LAW

This suit arises out of damage to a boiler unit.  On or about November 11, 2008, a boiler unit (the "Boiler") manufactured by third-party defendant, The Babcock & Wilcox Company, now known as Babcock & Wilcox Power General Group, Inc. ("B&W"), owned by plaintiff Pt. Jawamanis Rafinasi ("Rafinasi"), and insured by plaintiff XL Specialty Insurance Co. ("XL") (collectively "Plaintiffs"), was shipped by B&W via railcar to defendant Coastal Cargo Company, Inc. ("Coastal") at its terminal in New Orleans, Louisiana.  At the terminal, Coastal off-loaded the Boiler from the railcar and stored it on its premises pending the arrival of the vessel, M/V RICKMERS DALIAN (the "Vessel"), for overseas transportation.  On December 1, 2008, Coastal moved the Boiler on a Mafi trailer from its warehouse to the Vessel for loading. While transporting the Boiler on the Mafi, Coastal's driver turned the Mafi, causing the Boiler to fall off the trailer and sustain the damage at issue.

On December 1, 2009, Plaintiffs filed the present suit against Coastal, alleging the damage to the Boiler was caused by Coastal's negligence and that Coastal is liable for breach of warranty and/or breach of contract.  (R. Doc. 1).  Plaintiffs seek damages in the amount of $284,415.00, plus survey fees, legal interest, and costs.  Coastal filed an Answer denying Plaintiffs' allegations and raising several affirmative defenses.  (R. Doc. 3).

1

On December 16, 2010, Coastal filed a Third-Party Complaint against B&W alleging that B&W, as the party responsible for manufacture and shipment of the Boiler, caused or contributed to the Boiler's damage.  (R. Doc. 15).  Specifically, Coastal claims B&W negligently failed to warn or provide instructions or drawings to Coastal regarding the proper lifting, loading, or securing of the Boiler.  B&W filed an Answer, denying liability on the basis that the damage to the Boiler was the sole fault of Coastal.  (R. Doc. 25).

On May 24, 2011, B&W filed a motion for summary judgment.  (R. Doc. 28).  Thereafter, on June 30, 2011, the Court issued an Order & Reasons, denying the motion.  (R. Doc. 41).

At the pretrial conference in this matter, counsel informed the Court that they had resolved all outstanding issues and disputes in the litigation except for two: (1) whether the Carriage of Goods by Sea Act ("COGSA") applies to the claims of Plaintiffs against Coastal, and (2) whether B&W is liable for negligence in whole or part for the damage caused to the Boiler. *See* (R. Doc. 48).  Accordingly, the Court and parties agreed that in lieu of a bench trial, the parties would submit briefing and evidence on these issues for the Court to resolve.  *See id.*  The parties subsequently filed trial briefs addressing these issues, *see* (R. Docs. 49, 50, 51, 52, 53, 54, 55), and submitted joint deposition testimony.

The Court has carefully considered the briefs, exhibits, and deposition testimony submitted by the parties.  Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court issues the following Findings of Fact and Conclusions of Law for the two remaining issues in the litigation: (1) the application of COGSA in the main claims, and (2) B&W's negligence in the third-party claims.  To the extent that any finding of fact may be construed as a conclusion of

law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court adopts its as such.

## FINDINGS OF FACT

### The Parties

(1)

Plaintiff Rafinasi is a foreign corporation or other legal entity organized and existing pursuant to the laws of a foreign country with its principle place of business in Indonesia, and which at all times was the owner of the Boiler. (R. Doc. 1).

(2)

Plaintiff XL is an insurer incorporated in the State of Delaware and with its principle place of business in New York, New York, and at all times was the insurer of the Boiler. (R. Doc. 1).

(3)

Defendant Coastal is a Louisiana corporation authorized to do and doing business in Louisiana with its principle place of business in New Orleans, Louisiana, and which was engaged in the business of providing warehousing, terminal handling, transportation, and stevedoring services with regard to the Boiler. (R. Doc. 1); Coastal Ex. 16; Dep. Arthur Coste 50:21-23 (Apr. 7, 2001).

(4)

Third-party defendant B&W is a corporation organized and existing under the laws of the state of Delaware, doing business in the state of Mississippi, and was the manufacturer and shipper of the Boiler. (R. Doc. 25).

3

**Contract Between Rafinasi and B&W**

(5)

On June 1, 2007, B&W submitted to Rafinasi a proposal, data, and pricing for the manufacture of the Boiler, a FM117-97, package boiler for "PT Baruna Bosara Trans International."  B&W Exs. 1, 2.

(6)

On October 17, 2007, the contract for the Boiler was executed by Rafinasi and B&W, and Rafinasi issued a Purchase Order to B&W.  B&W Exs. 3, 4.

(7)

This contract provides, "SHIPPING POINTS/TRANSPORTATION CHARGES-B&W shall cause the Equipment to be shipped from its Plant, F.A.S. port of exit....upon arrival of the Equipment F.A.S. port of exit, BUYER shall be responsible for any demurrage, towboat of ship standby charges, all unloading and any transshipment."  B&W Ex. 3.

(8)

F.A.S. stands for "Free Alongside Ship" which means the seller fulfills his obligation once the goods are delivered, and the buyer bears all risks of loss or damage to the goods upon delivery.  *Tools of the Trade*, International Commercial Practices Commission (March 13, 2012) http://www.shipamerican.com/frgloss.htm.

**Agreements for Transporting the Boiler from Railcar to Vessel**

(9)

Rafinasi entered into a "load contract" with ATS International whereby ATS would provide "terminal handing, export boxing, and port labor" for the Boiler.  B&W Ex. 8.

(10)

On November 26, 2008, Coastal submitted an invoice to ATS for Coastal's "terminal handling" for the Boiler to be loaded on the M/V RICKMERS DALIAN.  B&W Ex. 9.

(11)

Coastal's Terminal Tariff contains the following provision on Responsibility for Loss or Damage to Cargo,

Shippers or receivers of cargo, the vessel, her owners, charters, and agents, or in instances of outside operators functioning as set forth in this tariff, must protect such cargo from loss or damage from any cause, including but not limited to, loss or damage from pilferage, rodents, insects, shrinkage, wastage, decay, seepage, heat, cold, evaporation, fire, leakage or discharge from sprinkler system, rain, floods, or the elements, defects or leaks in or around buildings or other structures, war, riots, strikes, civil commotion, acts of third persons, or other causes whatsoever, provide however that this provision will not relieve CCC from any liability which may arise out of its own negligence.  Coastal Ex. 16.

(12)

The Terminal Tariff also provides regarding "Limitation of Liability for Loss or Damage," "[Coastal] shall not be liable for any damage unless caused by its negligence or the negligence of its servants.  In all events its liability will be limited to the lesser of the actual damages caused or $500.00 per package or customary freight unit."  Coastal Ex. 16.

(13)

An unsigned, undated "Dock Receipt" notes ATS, "C/O Babcock & Wilcox," are "Shipper/Exporter;" and that with regard to the Boiler, "RAIL CAR BAWX106 WILL ARRIVE NEW ORLEANS, LA AVE TERMINAL 11/7/08.  BOOKING: SPO00001440NA08 VESSEL: RICKMERS DALIAN ETD 11/30."  B&W Ex. 10.

(14)

This Dock Receipt also contains the following provision, "[r]eceived the above described

5

goods or packages subject to all the terms of the undersigned's regular form of dock receipt and bill lading which shall constitute the contract under which the goods are received, copies of which are available from the carrier on request and may be inspected at any of its offices." Coastal Ex. 3.

(15)

On June 25, 2008, Coastal and non-party, Rickmers-Linie Gmbh Cle. KG Hamburg ("Rickmers"), owner and operator of the Vessel, entered into a contract whereby it was agreed that Coastal would handle all stevedoring and terminal activities for Rickmers "on all of its ocean going vessels calling on the Port of New Orleans Louisiana." Coastal Ex. 13; Dep. Don M. Zemo 14:16-20 (Oct. 25, 2011).

(16)

The Coastal-Rickmers contract charges Rickmers for Coastal's stevedoring services on "Project Cargo...on a under hook basis." Coastal Ex. 13.

(17)

The Boiler constitutes "Project Cargo." Dep. Loper 27:5-8.

(18)

The Coastal-Rickmers contract contains a choice-of-law provision, selecting German law as the governing law for all disputes arising thereunder. Coastal Ex. 13.

## **Shipping Contract**

(19)

Rickmers was retained to provide the Vessel to transport the Boiler from New Orleans to

6

Jakarta.  B&W Exs. 7, 11; Coastal Exs. 2, 15.

(20)

The Rickmers' Booking Note provides, "[s]ubject to full details and technical drawings of the special cargo clearly showing such as but not limited to: center of gravity, lifting and lashing points, dimensions and position and construction of cradle.  Special lifting devices, others than being available on board of carrying vessel, such as spreader/beam, if needed for loading and discharge, to be supplied by shippers at their expense." Coastal Ex. 2.

(21)

The Booking Note also provides, "this contract shall be performed subject to the terms of the 'Rickmers-Linie Bill of Lading.'" Coastal Ex. 2.

(22)

The Booking Note's "Shipment terms" are "FLT H/H (FLT Hook/Hook)."  Coastal Ex. 2.

(23)

FLT Hook/Hook generally means the shipper arranges for delivery of cargo to a vessel's hook and for shore-based stevedoring services, while the vessel is responsible for stowing the cargo and on-board lashing and securing.  Chartering Terms and Conditions (March 13, 2012) http://www.charteringterms.com.

(24)

Similarly, the shipper pays Coastal, as the stevedore, for its work before the cargo is hooked up for loading on the vessel; and from there on Coastal is compensated by the vessel. *See* Dep. Ronald Rose 34:11-35:8 (Oct. 25, 2011).

(25)

The Rickmers-Linie Bill of Lading form contains a "U.S. Carriage of Goods by Sea Act

Limitation," providing

Notwithstanding any of the foregoing to the contrary, in the event that suit is brought in a court in the United States of America and such court, contrary to Clause 25, accepts jurisdiction, then the Carriage of Goods by Sea Act (COGSA) shall be compulsorily applicable to this contract of carriage if this Bill of Lading covers a shipment to or from the United States.  The provisions set forth in COGSA shall also govern before the Goods are loaded on or after they are discharged from the vessel provided, however, that the Goods at said time are in the actual custody of the Carrier or any Servant or Agent.  The Carrier's maximum liability in respect to the Goods shall not exceed USC 500 per package or, where the Goods are not shipped in packages, USD per customary freight unit unless the nature and value of the Goods has been declared by the merchant and inserted in writing, on the face of the bill of lading and said merchant shall have paid the applicable ad valorem freight rate set forth in the Carrier's tariff.  Coastal Ex. 4.

(26)

With regard to the applicable COGSA time period, the Bill of Lading form provides,

The Carrier shall be under no liability whatsoever for loss of or damage to the Goods howsoever occurring, if such loss or damage arises prior to loading on or subsequent to the discharge from the vessel.  Notwithstanding the above, in the event that the applicable compulsory law provides the contrary, the Carrier shall have the benefit of every right, defense, limitation and liberty in the Hague-Visby Rules or the Hague Rules, notwithstanding that the loss or damage did not occur at sea.  In the event that the Bill of Lading, covers a shipment to or from the United States or territories where COGSA is applicable, however, the Carriage of Goods by Sea Act (COGSA) shall be applicable before the Goods are loaded on or after the are discharged from the vessel. Coastal Ex. 4.

(27)

The Bill of Lading form also contains the following "Sub-contracting and Indemnity"

provision:

It is hereby expressly agreed that no servants or agents are, or shall be deemed to be liable with respect to the goods as carrier, bailee or otherwise.  Without prejudice to the foregoing the servants or agents are intended as beneficiaries of all terms and conditions including the jurisdiction clause.  If, however, it shall be adjudged that any other than the carrier is carrier or bailee of the goods or under any responsibility with respect thereto, all exemptions and limitations of and exoneration from liability provided by law or by the terms hereof shall be available to such servant or agent.  No claim shall be made against any of the servants or agents for any liability whatsoever in connection with the carriage of the goods whether or not arising

8

out of negligence on the part of such person and, if any such claim is made, the merchant shall
indemnify the carrier against all consequences thereof.  Coastal Ex. 4.

(28)

　　　The Bill of Lading form defines "servants or agents" as including,

"the Master, Officers and crew of the vessel, owners and operators of vessels (other than the

Carrier), underlying carriers, sub-contractors, stevedores, terminal and groupage operators, road

and rail transport operators and any independent contractors employed by the Carrier in the

performance of the Carriage."  Coastal Ex. 4.

(29)

　　　This Bill of Lading form was not filled out nor issued for the Boiler.  Coastal Ex. 4.


**Transportation of the Boiler from B&W to Coastal**

(30)

　　　B&W manufactured the Boiler at its facilities in West Point, Mississippi.  Coastal Ex. 1.

(31)

　　　After the Boiler was manufactured, it was placed on B&W's Railcar No. BAWX106 for

delivery to the Seventh Street Wharf, New Orleans, Louisiana, where it was to be loaded aboard

the M/V RICKMERS DALIAN pursuant to Booking Note SPO000001440NA08.  *See* B&W

Exs. 5, 6, 7; Coastal Ex. 1.

(32)

　　　Coastal employees observed that large cement counterweights were installed and secured

onto the Railcar; the counterweights were used to offset the weight of the Boiler because it is

heavier on one side, causing it to have an off center-of-gravity.  *See* B&W Ex. 6; Dep. Robert J.

9

Ruhl 19:4-19 (April 7, 2011); Dep. Rose 15:12-15.

(33)

The Railcar arrived at the Seventh Street Wharf on or about November 11, 2008; the vessel was not scheduled to arrive until November 30, 2008.  Coastal Ex. 1.

(34)

After arrival of its Railcar at the Wharf, B&W contacted Coastal, advising that the Railcar needed to be returned to B&W which required that the Boiler be removed from the Railcar and stored by Costal until arrival of the Vessel.  Coastal Ex. 1; Zemo Dep. 33:17-19.


**Unloading of the Boiler from the Railcar to the Mafi Trailer**

(35)

Coastal, as a terminal stevedore operator, loads and unloads vessels, rail cars, and trucks for import and export, as well as lashes and secures cargo.  Dep. Zemo 8:17-22.

(36)

It was Coastal's responsibility to ensure that the Boiler was properly received at its facilities and loaded on the vessel.  *See* Dep. Coste 56:1-25.

(37)

Don Zemo, Coastal's General Manager of Stevedoring Terminals for Louisiana, is in charge of all operations, financials, management, and customer service.  *See* Dep. Don Zemo 7:16-21, 8:9-14; 53:17-25.

(38)

Arthur Coste works under Mr. Zemo as the Operations Manager for Coastal and is

10

responsible for managing all outside operations for Coastal at its New Orleans location.  Dep.

Coste 7:9-17; 8:8-10.

(39)

Robert J. Ruhl, a Coastal walking foreman, supervised the discharge of the Boiler from

the Railcar and its unloading on to the Mafi.  Dep. Ruhl 13:2-23; 16:1-16; 31:13-16.

(40)

Mr. Zemo directed Mr. Ruhl to load the Boiler on the Mafi, the only available means for

transferring the Boiler to the vessel.  Dep. Zemo 56:5-8.

(41)

The Mafi is a type of heavy-duty trailer that is able to carry overweight and oversized

cargo.  Dep. Michael Loper 26:21-25 (Aug. 2, 2011).

(42)

Mr. Ruhl was informed of the weight of the Boiler before moving it, but he did not ask

for further information for moving the Boiler; nor did he think he needed any further information

for moving the Boiler on to the Mafi.  Dep. Ruhl 25:8-23.

(43)

Mr. Ruhl knew the Boiler was heavier on one side because of the location of the

counterweights and lifting lugs and because the Boiler was lifted straight-up by the cranes.  Dep.

Ruhl 26:2-4, 26:23-28:5.

(44)

It is standard operating procedure for manufacturers to provide markings and information

on center-of-gravity, lifting points, and securing points for large cargo like the Boiler.  Dep.

11

Loper 34:3-6, 19-21; 35:6-8; 62:7-17; Dep. Swenson 30:20-24.

(45)

The Boiler did not have any markings or information for center-of-gravity, lifting points, or securing points. Dep. Ruhl 95:1-8; Dep. Coste 62:2-7; 72:4-23; Dep. Loper 33:8-9, 64:11-14.

(46)

However, the lifting-points on the Boiler were visible.  Dep. Swenson 31:1-5.

(47)

Markings and/or information as to center-of-gravity, lifting points, and/or securing points for the Boiler may have been helpful, but were not critical for safely transporting the Boiler. Dep. Ruhl 95:1-8; Dep. Coste 62:2-7; 72:4-23; Dep. Loper 62:2-6.

(48)

On November 19, 2008, Coastal employees transferred the Boiler from the Railcar to the Mafi, utilizing two mobile shore cranes rigged with drop wires attached to lifting lugs on top of the Boiler.  B&W Ex. 13; Coastal Ex. 1; Dep. Zemo 13, 25:20-23; Dep. Ruhl 30:13-20.

(49)

The only persons present while the Boiler was moved from the Railcar to the Mafi were Mr. Ruhl, two crane operators, and two laborers.  Dep. Ruhl 16:17-17:23; 34:6-19.

(50)

The Boiler was secured to the Mafi by four, five-ton chains, one in each corner.  Dep. Ruhl 36:2-7; 41:3-10; Dep. Loper 29:4-11.

(51)

Because the Boiler took up almost the entire length of the Mafi and due to its off-center

12

gravity, Coastal was unable to completely secure the Boiler to the trailer.  Ruhl Dep. 31:18-32:5;
Dep. Coste 70:14-20; Dep. Loper 29:12-22.

(52)

Coastal did not, at the time, have any larger or wider Mafi trailers it could have used to
transport the Boiler; nor could have cranes been used to transport the Boiler.  Ruhl Dep. 32:13-
16; Dep. Coste 49:15-17.

(53)

The Boiler was transloaded on to the Mafi without incident.  Coastal Ex. 1; Ruhl Dep.
32:17-25.

(54)

Because the Vessel was not available at the time the Boiler was unloaded from the
Railcar, it had to be stored at Coastal's facility until the arrival of the Vessel.  Coastal Ex. 1;
Ruhl Dep. 34:20-25; 52:1-3; Dep. Zemo 25:23-25.

(55)

Accordingly, Mr. Ruhl used a fifth-wheel truck to pull the Mafi and Boiler so it could be
stored alongside Coastal's warehouse, between Coastal's Harmony and Seventh Street terminals.
Ruhl Dep. 35:1-3; 52:5-10; Dep. Zemo 25:5-9; 34:12.

(56)

While driving the Mafi with the Boiler attached, Mr. Ruhl drove as slowly and carefully
as possible.  Dep. Ruhl 53:13-54:10.

(57)

Mr. Ruhl was concerned about the Boiler falling off the Mafi while it was being pulled

because of its large size and off-center-of-gravity.  Dep. Ruhl 47:1-9; 53:7-14.

(58)

Mr. Ruhl positioned the Mafi with Boiler attached so that it would be a "straight shot" from where it was stored to where the vessel would be during loading.  Dep. Ruhl 54:15-18; 68:9-12; 89:21-25; Dep. Zemo 38:2-8, 39:17-22.

(59)

Mr. Ruhl positioned the Mafi so that it would be driven straight to the vessel because he believed that, due to the Boiler's heaviness on one side, if the trailer turned, the Boiler could fall off.  Dep. Ruhl 54:17-25; 65:4-9; 68:9-12; 89:20-25; Dep. Coste 24:2-11.

(60)

As soon as Mr. Ruhl parked the Mafi with the Boiler on it, he contacted his supervisor, Mr. Coste, and asked him to look at the positioning of the Boiler on the Mafi to ensure it was properly secured.  Coste Dep. 19:5-17.

(61)

Mr. Ruhl told Mr. Coste that the trailer should not be turned because the Boiler's center-of-gravity was "off" and it was "top heavy."  Dep. Ruhl 65:10-21; Dep. Coste 19:18-21.

(62)

Mr. Coste was able to determine on his own that the Boiler was top-heavy and had an off-center of gravity by the location of the hook-up points on one side of the Boiler and the way it centered when lifted by the cranes.  Dep. Coste 20:1-19.

(63)

Mr. Coste also knew that if the Mafi was turned, there was concern that the Boiler would

fall off.  Dep. Coste 24:1-20.

(64)

Mr. Ruhl informed his coworkers they needed to be careful in moving the Mafi because of its large size and its off-center of gravity.  Dep. Ruhl 47:5-9.

(65)

After meeting with Mr. Ruhl, Mr. Coste reported to his supervisor, Mr. Zemo, that the Boiler was chained down to the Mafi, it would sit this way until the vessel arrived, and then it was to be driven slowly and straightforward to the vessel upon arrival.  *See* Dep. Coste 23:8-25; 25:16-26:3.

(66)

Nevertheless, Michael Loper, a marine surveyor, opines that the Coastal employees did not know the center-of-gravity for the Boiler.  Dep. Loper 31:16-19, 33:8-13.

## Moving the Boiler on the Mafi to the Vessel for Loading

(67)

On December 1, 2008, at the Coastal facility's Seventh Street Wharf, the Boiler was scheduled for loading upon the Vessel.  Dep. Ruhl 58:2-4; Dep. Rose 12:2-6; Dep. Zemo 35:2-11.

(68)

Ronald Rose was the Port Captain for the Vessel on December 1, 2008.  Dep. Rose 11:7-10, 21-24; Dep. Ruhl 53:2-4, 70:16-18.

(69)

Cpt. Rose's duties as Port Captain include, "to plan the loading, discharging of the vessel, work with the stevedores to see that they understand the plan, act as liaison between the stevedore and the vessel's command and visa versa and to see that the cargo gets loaded in a safe and correct manner and discharged in a correct and safe manner." Dep. Rose 22:13-21.

(70)

On December 1, 2008, Coastal served as the stevedore for loading the Boiler on the Vessel. Dep. Rose 12:6-8.

(71)

Before loading cargo on a vessel, it is routine for the captain of the vessel to meet with the stevedores to discuss the plan for loading, particularly when the cargo is top-heavy and/or has an off-center-of-gravity. Dep. Rose 12:20-23; Dep. Swenson 23:14-25.

(72)

A pre-loading meeting was held between Rickmers, represented by Cpt. Rose, and Coastal, represented by Mr. Coste, prior to the transport of the Boiler to discuss handling and loading the Boiler on the Vessel. Dep. Coste 31:10-20; 33:15-20; 48:14-23; Dep. Swenson 24:13-25:9; 34:3-5 50:9-24; 51:5-9; Dep. Zemo 23:5-22, 58:23-59:22; Dep. Rose 13:2-11, 23:15-18.

(73)

Mr. Zemo spoke on the telephone with Cpt. Rose prior to moving the Boiler, but Mr. Zemo did not tell Cpt. Rose the Mafi had to be driven slowly and straightforward. Dep. Zemo 62:4-13.

(74)

16

Coastal's superintendent Gabriel Swenson was assigned to oversee the Boiler's transportation on the Mafi to ship-side for loading on the Vessel.  Coastal Ex. 10; Dep. Gabriel Swenson 11:3-8, 15:2-5, 16:8-14, 24:13-25:9; 50:9-24; 51:5-9 (Aug. 19, 2011).

(75)

Mr. Swenson was brought in at the last minute for this assignment and did not attend the pre-meeting regarding transporting and loading the Boiler.  *See id.*

(76)

Mr. Coste, who did attend the pre-meeting, is Mr. Swenson's supervisor.  Dep. Swenson 12:1-13.

(77)

Mr. Swenson was instructed by both Mr. Ruhl and Mr. Coste that the Mafi was to be driven slowly and straightforward to the Vessel and that turning of the trailer would risk the possibility of damaging the Boiler.  *See* Dep. Coste 41:19-42:6; Dep. Swenson 19:1-25, 20:11-13.

(78)

Prior to transporting the Boiler, Mr. Swenson was not informed of the center-of-gravity for the Boiler, nor the lifting points.  Dep. Swenson 20: 14-25; Dep. Ruhl 80:18-22.

(79)

Cpt. Rose, as the port captain for Rickmers and a customer of Coastal, has the authority to determine which crane to use for loading on the Vessel, where to locate the cargo for loading, and how to load the cargo.  Dep. Zemo 44:14-20; Dep. Rose 19:12-15, 24:4-11.

(80)

17

Cpt. Rose was informed by Coastal personnel that the Mafi was only to be backed-down to the Vessel.  Dep. Rose 26:16-24.

(81)

The loading of the Boiler commenced when Cpt. Rose informed Mr. Swenson that the Vessel was ready to load the Boiler.  Dep. Swenson 17:5-21.

(82)

Mr. Swenson then directed Coastal's truck driver, Hilarie Arabie, to move the Boiler on the Mafi down to the Vessel, under the crane hook, for loading.  Dep. Swenson 16:8-25; 18:6-17.

(83)

The Malfi and Boiler were driven in a straight line and successfully moved from the storage location towards the Vessel.  *See* Dep. Ruhl 72:1-24; Dep. Coste 29:12-24; Dep. Swenson 26:16-21.

(84)

The Mafi was driven in a straight path until it was ship-side with the Vessel, with its lifting points facing away from the Vessel.  Dep. Coste 57:10-25, 59:6-8; Dep. Rose 16:21-22; Dep. Swenson 29:1-2; Dep. Zemo 40:7-9.

(85)

Cpt. Rose did not think the Vessel's cranes would be able to lift the Boiler in this position because the lifting points were too far away.  Dep. Rose 16:24-18:1; 27:1-23; Dep. Coste 36:4-21; 42:7-19; 59:9-12; Dep. Swenson 28:2-14; Dep. Zemo 41:3-13, 43:4-8.

(86)

Cpt. Rose told Coastal the Boiler had to be repositioned for loading but did not tell

18

Coastal how to reposition the Boiler.  Dep. Rose 28:7-10, 29:13-15, 30:7-24.

(87)

Mr. Swanson did not challenge Cpt. Rose's opinion, instead deferring to Cpt. Rose's authority and experience, and directed Mr. Arabie to reposition the Mafi so that the cranes could load the Boiler onto the Vessel.  *See* Dep. Coste 41:15-18; Dep. Swenson 27:9-23; 32:23-33:1; 35:21-25; 55:14-23.

(88)

Mr. Arabie then turned the Mafi in an effort to reposition the Boiler for loading on the vessel.  Dep. Rose 18:6-8.

(89)

It was during the turning of the Mafi away from the Vessel that the Boiler fell off the Mafi, sustaining damage.  *See* Coste Dep. 40:16-41:3; Coastal Ex. 1; Dep. Loper 30:1-7; Dep. Swenson 41:19-24; Dep. Zemo 41:2-3.

(90)

Mr. Swanson should have called his supervisor, Mr. Coste, before complying with Cpt. Rose's direction to move the Mafi closer to the Vessel.  Dep. Coste 66:6-13.

(91)

Had it been communicated to Mr. Swenson that the Boiler was top-heavy and had an off-center-of-gravity he likely would have contacted his supervisor, Mr. Coste, before moving the Mafi.  Dep. Sweson 36:1-37:7.

(92)

Turning the Mafi was a direct violation of Coastal's management's orders.  Dep. Zemo

19

95:23-96:14; 102:2-7.

(93)

Mr. Coste, Mr. Swenson, and Mr. Zemo all believe the Boiler could have been loaded in its original position alongside the Vessel.  Dep. Coste 37:7-38:14; 42:22-44:12; Dep. Swenson 27:9-16; 55:24-25:15; Dep. Zemo 52:14-21.

(94)

But for the turning of the Mafi, the Boiler would not have fallen off the trailer.  Dep. Coste 49:15-17.


**After the Incident**

(95)

After the Boiler fell from the Mafi, Coastal used four cranes to stand it up and place it back on to a railcar.   Dep. Ruhl 73:2-75:20.

(96)

Mr. Zemo was issued an "Employee Counseling/Warning Form" on December 17, 2008, for the incident involving the Boiler, providing, "[w]hile transporting a boiler to the M/V Rickmers Dalian on a Mafi trailer the boiler toppled off the Mafi.  Don knew of the risk of this happening, and had several meetings with the operations people about what could happen.  Don should have been in attendance of this move or have the proper management on site to make sure his orders were followed."  B&W Ex. 16; Dep. Coste 45:22-23.

(97)

On the same date, Mr. Coste, was also issued an "Employee Counseling/Warning Form,"

as a result of the incident involving the Boiler, providing "[w]hile transporting a boiler to the M/V Rickmers Dalian on a Mafi trailer the boiler toppled off the Mafi.  Bubba and Don had several meetings and conversations about the sensitivity of moving the boiler, it had been discussed several times not to turn the Mafi while moving the load.  Bubba should have been on site to ensure the instructions were carried out."  B&W Ex. 17; Dep. Coste 45:20-21.

(98)

Also on December 18, 2008, Mr. Swenson was issued an "Employee Counseling/Warning Form" as a result of the incident involving the Boiler, providing, "Gabe was instructed to move a heavy lift that was on a Mafi to drive it 'straight' to the vessel side. After the piece was driving straight to the vessel side, Gabe was given instructions by the Port captain to turn it around, Gabe did this without consulting me first."  B&W Ex. 18; Dep. Coste 45:18-19.

(99)

On September 30, 2009, ten months after the Boiler was damaged, Michael A. Loper, a Senior Marine Surveyor, issued a cargo damage survey report for the damaged Boiler.  Coastal Ex. 1; Dep. Loper 14:6-12, 15:6-12.

(100)

Michael A. Loper, Senior Marine Surveyor, opined that the damage to the Boiler occurred:

(1) due to the Boiler not being provided with markings detailing 'Center of Gravity,' 'Lifting Points,' and/or 'Securing Points,' and (2) due to Babcock and Wilcox personnel supplying no information whatsoever with regard to instructions on how to stow the Boiler on the Mafi trailer and secure the same, and (3) Babcock and Wilcox's failure to provide drawings or information regarding 'Center of Gravity,' 'Lifting Points,' and/or 'Securing Points.'  Coastal Ex. 1. Dep. Loper 45:2-5, 66:20-24; 62:2-6.

(101)

Mr. Loper interviewed Mr. Ruhl for his report, but was unable to recall who else he spoke with regarding the Boiler.  Dep. Loper 20:16-21, 21:5-23, 22:1-24:4, 53:23-25.

(102)

Mr. Loper was unable to opine what would have changed had the Boiler been stenciled with center-of-gravity markings.  Dep. Loper 38:20-25.

(103)

Mr. Loper acknowledged that one could "pretty much" determine the Boiler was top-heavy and had an off-center-of-gravity just by looking at it.  Dep. Loper 41:8-12.

(104)

Mr. Loper opined that if the Coastal employees handling the Boiler had questions about moving and loading it, it would have been their "burden" to and "absolutely" prudent for them to ask B&W regarding such.  47:2-5; 59:8-11.

(105)

No employees at Coastal told Mr. Loper that the absence of lifting and center-of-gravity markings and/or instructions caused them problems with handling the Boiler.  Dep. Loper 48:15-23; 49:4-50:12.

(106)

Sometime after the Boiler was damaged, a similar boiler was loaded on a similar vessel without incident.  *See* Coastal Ex. 14; Dep. Rose 19:21-22:4.


**CONCLUSIONS OF LAW**


22

**Threshold Legal Issues**

(107)

Subject matter jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1332, as there exists complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00.  (R. Doc. 1).

(108)

Personal jurisdiction exists over the parties.  *See* Fed. R. Civ. P. 12(h); *see generally J. McIntyre Mach., Ltd. v. Nicastro*, 131 S.Ct. 2780, 2787-88 (2011).

(109)

Venue is proper in this district as the events giving rise to the litigation occurred within the Eastern District of Louisiana.  28 U.S.C. § 1391.  (R. Doc. 1).

**Application of COGSA**

(110)

The contract engaging Rickmers as the carrier for the Boiler is governed by maritime law.  *See Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 24 (2004); 1 Admiralty & Maritime Law § 10-8 (5th ed. 2011).

(111)

The Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 30702, *et seq.* generally "applies to a carrier engaged in the carriage of goods to or from any port in the United States." 46 U.S.C. § 30702.

(112)

A "carrier" is defined under COGSA as "the owner, manager, charter, agent, or master of

23

a vessel."  46 U.S.C. § 30701.

(113)

Rickmers, as the owner of the vessel, constitutes a carrier under COGSA.

(114)

A contract for carriage is a prerequisite for the application of COGSA.  1 Admiralty &

Maritime Law § 10-16 (5th ed. 2011).

(115)

"The bill of lading is a contract between the carrier and the shipper."  *Am. Roll-On Roll-*

*Off Carrier, LLC v. P & O Ports Baltimore, Inc.*, 479 F.3d 288, 293 (4th Cir. 2007).

(116)

"By its terms, COGSA governs bills of lading for the carriage of goods 'from the time

when the goods are loaded on to the time when they are discharged from the ship.'"  *Norfolk*,

543 U.S. at 29(quoting 46 U.S.C.App. § 1301(e)).

(117)

However, COGSA permits contractual extension of its governing time period.  *Id.* (citing

46 U.S.C.App. § 130).

(118)

The Rickmers' Bill of Lading form extends the default time period for COGSA to

"before the Goods are loaded on or after they are discharged from the vessel."  Coastal Ex. 4.

(119)

COGSA contains a "package limitation" which provides:

"'Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to

or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States...unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading.'" *Norfolk*, 543 U.S. at 19-20 (quoting 46 U.S.C.App. § 1304(5)).

(120)

In certain circumstances, the inclusion of a "Himalaya Clause" in a carriage contract can extend liability limitations, such as the package limitation of COGSA, to sea and land carriers downstream of the contracting parties, including stevedores.  *See id.* at 20, 29; *Am. Roll-On Roll-Off Carrier*, 479 F.3d at 293-94("[T]he Himalaya clause is the vehicle through which the carrier's COGSA defenses to cargo claims are extended to the stevedores."); 1 Admiralty & Maritime Law § 10-8 (5th ed. 2011)("[C]ourts have been willing to hold that the parties to a contract of carriage may limit the liability of a stevedore, terminal operation, or other independent contractor by appropriate expressions of intent in the bill of lading or charter party.").

(121)

A Himalaya clause is to be construed like any other clause in a contract, by its terms and consistent with the intent of the parties.  *Norfolk*, 543 U.S. at 31.

(122)

The Rickmers' Bill of Lading form contains a Himalaya Clause extending limitation of liability to "agents and servants" of Rickmers.  *See* Coastal Ex. 4; *see generally Norfolk Southern*, 543 U.S. at 31.

(123)

25

The burden is upon the party seeking limitation of liability to demonstrate the COGSA package limitation is applicable. *See Servicios-Expoarma, C.A. v. Indus. Mar. Carriers, Inc.*, 135 F.3d 984, 994-95 (5th Cir. 1998).

(124)

"[T]erminal operators and stevedores may be able to take advantage of an ocean carrier's COGSA defenses and limitations if they are functioning as agents or contractors of the carrier." 1 Admiralty & Maritime Law § 10-8 (5th ed. 2011).

(125)

In determining whether Coastal was an agent of either B&W or Rickmers at the time of the Boiler damage, "the main inquiry...is which party controlled the negligent stevedore that caused the damage." *Thyssen, Inc. v. Nobility MV*, 421 F.3d 295, 307 (5th Cir. 2005).

(126)

Another inquiry relevant to the agency issue is whether "'the nature of the services performed [by the stevedore] compared to the carrier's responsibility under the carriage contract.'" *Akiyama Corp. of Am. v. M.V. Hanjin Marseilles*, 162 F.3d 571 (9th Cir. 1998).

(127)

The Court notes the following in considering whether Coastal was an agent of Rickmers at the time the Boiler was damaged:

(A) Pursuant to its contract with B&W, once the Boiler was delivered, Rafinasi was responsible for the loading and transhipment of the Boiler;

(B) Rafinasi retained ATS for terminal handling and port labor regarding the Boiler;

(C) Coastal submitted an invoice to ATS for the terminal handling of the Boiler;

26

(D) Coastal and Rickmers entered an agreement whereby Coastal served as Rickmers' stevedore for all of Rickmers' New Orleans operations;

(E) Rickmers' Booking Note provided that Rickmers' responsibilities with regard to the Boiler were "FLT H/H (hook to hook);

(F) This Booking Note also required the shipper to provide at its expense, special lifting devices if needed for loading and discharge of the Boiler;

(G) Cpt. Rose instructed Coastal he needed the Boiler closer to the vessel crane to load the Boiler, but he did not direct Coastal how to move the Boiler;

(H) The Boiler was never hooked up to the vessel cranes nor loaded on the vessel;

(I) Coastal should not have turned the Mafi to move the Boiler closer to the vessel without first consulting its supervisors, and doing so was in violation of Coastal's instructions.

(128)

This evidence demonstrates that Coastal was not under the control of Rickmers at the time the Boiler was damaged, but rather was fulfilling its obligation to ATS and Rafinasi to handle the Boiler at the terminal, prior to loading the Boiler on the vessel and before it was subject to its stevedoring obligations to Rickmers.

(129)

Because Coastal was not serving as an agent to Rickmers at the time the Boiler was damaged, the COGSA package limitation in the unissued Bill of Lading form does not apply to Coastal in the present litigation.

**Limitation of Liability Under Coastal's Terminal Tariff**

27

(130)

Pursuant to 46 C.F.R. § 525.2, a "marine terminal operator," such as Coastal, cannot use a terminal tariff to obtain limitations of liability for cargo damage inconsistent with applicable law; nor can a marine terminal operator use a terminal tariff to relieve it from liability from its own negligence.

(131)

46 C.F.R. § 525.2 further provides that a terminal tariff made available to the public shall be enforced by courts as an implied contract between the marine terminal operator and the party receiving the services rendered by the marine terminal operator. *Id.*

(132)

However, 46 C.F.R. § 525.2 also provides,

"If the marine terminal operator has an actual contract with a party covering the services rendered by the marine terminal operator to that party, an existing terminal schedule covering those same services shall not be enforceable as an implied contract."

(133)

Here, because Rafinasi had a contract with Coastal, through its agent ATS, for marine terminal services, Coastal cannot rely on the limitation of liability provision in its Terminal Tariff.

(134)

Further, because Rickmers had its own contract with Coastal for marine terminal services, the Terminal Tariff also would not apply to Rickmers.

**B&W's Alleged Negligence**

(135)

Louisiana's substantive law governs the negligence claims of Plaintiffs against Coastal and Coastal against B&W in the present dispute. *See Coury v. Moss*, 529 F.3d 579, 584 (5th Cir. 2008).

(136)

Negligence under Louisiana law is examined under a duty-risk analysis, the relevant inquiries of which follow: (1) was the conduct of which the plaintiff complains a cause-in-fact of the resulting harm; (2) what, if any, duties were owed by the respective parties; (3) whether the requisite duties were breached; (4) was the risk and harm caused within the scope of protection afforded by the duty breached; and (5) were actual damages sustained. *Bursztajn v. United States*, 367 F.3d 485, 489 (5th Cir. 2004)(citing *Pitre v. La. Tech. Univ.*, 95-1466 (La. 5/10/96); 673 So. 2d 585, 589-90).

(137)

Louisiana is a pure comparative fault state which requires the Court to determine the percentage of fault of all persons "causing or contributing to the...loss...regardless of whether the person is a party to the action or a nonparty." La. Civ. Code art. 2323.

(138)

"A party's conduct is a cause-in-fact of the harm if it was a substantial factor in bringing about the harm. The act is a cause-in-fact bringing about the injury when the harm would not have occurred without it. While a party's conduct does not have to be the sole cause of the harm, it is a necessary antecedent essential to an assessment of liability." *Toston v. Pardon*, 03-

29

1747, p. 11 (La. 4/23/04); 874 So. 2d 791, 799 (citing *Netecke v. State*, 98-1182 (La. 10/19/99); 747 So. 2d 489, 487).

(139)

Based upon the evidence before the Court, B&W's failure to provide Coastal with markings and/or other handling information for the Boiler was not the cause-in-fact of the damage caused to the Boiler.

(140)

This supporting evidence includes:

(A) Coastal failed to sufficiently communicate to Mr. Swenson and Mr. Arabie the importance in moving the Mafi completely straightforward to the Vessel for loading;

(B) Mr. Swenson should have consulted a Coastal supervisor before violating his orders to move the Mafi straightforward to the Vessel for loading;

(C) The Boiler's lifting-points and off-center-of-gravity were obvious and apparent to Coastal employees;

(D) Coastal's expertise in stevedoring, particularly with other project cargo, should have enabled it to identify the proper methods for handling the Boiler;

(E) It was Coastal's responsibility to request lifting and transporting information for the Boiler if it was concerned about doing so;

(F) Coastal was already knowledgeable about the Boiler at the time of the incident because it previously unloaded the Boiler off the Railcar and moved it to a storage location on its facilities;

(G) Pursuant to the terms of the agreement between B&W and Rickmers, once the Boiler

30

was delivered to Coastal on the Railcar, B&W was no longer responsible for handling the Boiler; rather, the responsibility shifted to Coastal who was retained as a stevedore by Rafinasi, through ATS, to handle the Boiler after it was delivered by B&W; and

(H) After the incident, Coastal employees were reprimanded for their failure to properly handle the Boiler.

(141)

The assertion that B&W's failure to provide Coastal with markings and/or other information for handling the Boiler caused the damage to the Boiler is supported solely by the affidavit, report, and deposition of Mr. Loper.

(141)

However, Mr. Loper did not consider or did not accord sufficient weight to any of the foregoing evidence in reaching his opinion; thus, the Court finds his affidavit and testimony lacks credibility.

(142)

Thus, because the Court finds no cause-in-fact, it need not address the other negligence factors with regard to B&W, and Coastal is solely liable in negligence for the damage to the Boiler.

(143)

Coastal is responsible to Plaintiffs for all damages to the Boiler arising from the events which are the subject of the present litigation.

**LPLA**

(144)

31

The Louisiana Products Liability Act provides the exclusive remedy for claims against a manufacturer for damage caused by its product. La. Rev. Stat. § 9:2800.52; *see* La. Rev. Stat. § 9:2800.51, *et seq*.

(145)

The LPLA does not apply to the claims against B&W because the Boiler itself did not cause any damage. *See* La. Rev. Stat. § 9:2800.52(2).

## <u>CONCLUSION</u>

As noted above, the Court issues the present Findings of Fact & Conclusions of Law at the request of the parties who represented to the Court that they had resolved all other outstanding issues and disputes except those addressed here: (1) the application of COGSA, and (2) B&W's negligence. Now that these issues have been resolved, the Court will issue a judgment finally closing the matter. IT IS ORDERED that Plaintiffs are to file within two weeks a joint motion for entry of judgment and accompanying proposed judgment for the Court's consideration. If the parties are unable to agree on a proposed judgment, IT IS ALTERNATIVELY ORDERED that within two weeks each party is to submit its own motion and proposed judgment for the Court's consideration. IT IS FURTHER ORDERED that the proposed judgment is to account for the parties' prior agreement and resolution of any issues or disputes not addressed herein, as well as the issues and disputes resolved herein by the Court.

New Orleans, Louisiana this 26th day of March 2012.

_____

U.S. District Judge